UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
RACHELE PROPHETE-CAMILLE,

                          Plaintiff,

          -against-                          MEMORANDUM & ORDER
                                             14-CV-7268(JS)(AKT)
STERICYCLE, INC.,

                          Defendant.
----------------------------------------x
APPEARANCES
For Plaintiff:          Brian Adam Heller, Esq.
                        Davida S. Perry, Esq.
                        Schwartz & Perry
                        295 Madison Avenue
                        New York, NY 10017

For Defendant:          James V. Garvey, Esq.
                        Cara J. Ottenweller, Esq.
                        Jonathan A. Wexler, Esq.
                        Vedder Price P.C.
                        222 N. Lasalle Street, Suite 2600
                        Chicago, IL 60601

SEYBERT, District Judge:

          Plaintiff    Rachele    Prophete-Camille    ("Plaintiff")

commenced this action against Stericycle, Inc. ("Defendant" or

"Stericycle"), asserting claims for hostile work environment and

retaliation under Title VII of the Civil Rights Act of 1964 as

amended, 42 U.S.C. §§ 2000 et. seq. ("Title VII") and the New York

State Human Rights Law, N.Y. EXEC. LAW § 290 et. seq. ("NYSHRL").

Presently pending before the Court is Defendant's motion for

summary judgment.   (Def.'s Mot., Docket Entry 52.)   For the

following reasons, Defendant's motion is GRANTED IN PART and DENIED IN PART.

BACKGROUND[1]

Stericycle collects, processes, and disposes of medical waste, including "sharps" or needles, for various medical facilities. (Def.'s 56.1 Stmt., Docket Entry 52-2, ¶ 3.) In November 2009, Plaintiff began working at Stericycle as a Sharps Services Specialist. (Def.'s 56.1 Stmt. ¶ 4.) Plaintiff was a member of the International Brotherhood of Teamsters, Local 813 (the "Union") while she was employed at Stericycle. (Def.'s 56.1 Stmt. ¶ 5.)

In 2012 and 2013, Stericycle utilized a Team Member Handbook and Business Conduct Guideline that contained, inter alia, a harassment policy "stat[ing] that Stericycle does not tolerate any form of harassment, including harassment on the basis of sex," (the "Harassment Policy"). (Def.'s 56.1 Stmt. ¶¶ 9, 11.) The Harassment Policy states that employees should report harassment to their immediate supervisor, the Area Vice President of Human Resources for their area, or the Vice President of Human Resources. (Def.'s 56.1 Stmt. ¶ 12.) The Harassment Policy also provides the phone number for an employee help line. (Def.'s 56.1

---

[1] The following material facts are drawn from Defendant's Local Civil Rule 56.1 Statement and Plaintiff's Local Civil Rule 56.1 Counterstatement. Any relevant factual disputes are noted. All internal quotation marks and citations have been omitted.

Stmt. ¶ 13.)  On November 18, 2009, Plaintiff acknowledged receipt of the Team Member Handbook.  (Def.'s 56.1 Stmt. ¶ 17.)

Stericycle's Business Conduct Guideline contains a "Communications Channels" policy that provides that an employee who becomes aware of an "unlawful or unethical situation" should immediately inform Stericycle by contacting their manager or Human Resources, calling the confidential hotline, or sending a confidential communication directly to senior management.  (Def.'s 56.1 Stmt. ¶ 21.)  On November 18, 2009, Plaintiff acknowledged receipt of the Business Conduct Guideline.  (Def.'s 56.1 Stmt. ¶ 23.)

As a Sharps Service Specialist, Plaintiff traveled to hospitals and medical facilities in the New York area and was responsible for replacing full containers of sharps with empty containers.  (Def.'s 56.1 Stmt. ¶ 28.)  Different site supervisors were responsible for certain locations.  (Def.'s 56.1 Stmt. ¶ 29.)  Benjamin Hart ("Hart") served as Plaintiff's manager.  (Def.'s 56.1 Stmt. ¶¶ 26-27.)

Plaintiff took a disability leave of absence from July 4, 2011, through February 7, 2012.  (Def.'s 56.1 Stmt. ¶ 30.)  In early 2012, Plaintiff began working at the Katz Women's Center ("Katz") at Long Island Jewish Medical Center ("LIJ").  (Def.'s 56.1 Stmt. ¶ 31.)  At that time, Plaintiff began working with Alex Navarro ("Navarro"), a Service Supervisor who was responsible for

approximately fifteen locations, including LIJ. (Def.'s 56.1 Stmt. ¶¶ 34-35.) The parties dispute the amount of time Navarro spent at Katz. While Defendant alleges that Navarro did not work at LIJ every day and "pop[ped] in" at Katz once or twice per week, (Def.'s 56.1 Stmt. ¶¶ 36-37), Plaintiff alleges that "at one point" Navarro worked on-site at LIJ every day, (Pl.'s 56.1 Counterstmt., Docket Entry 54, ¶¶ 36-37). Defendant alleges that Navarro's conversations with Plaintiff "generally lasted only a few minutes," while Plaintiff disputes that assertion as a mischaracterization of her deposition testimony. (Def.'s 56.1 Stmt. ¶ 38; Pl.'s 56.1 Counterstmt. ¶ 38.)

During 2012, Plaintiff also worked at New York University ("NYU") three days per week and served LIJ two days per week. (Def.'s 56.1 Stmt. ¶ 39.) The Site Supervisor at NYU was Sal Vento ("Vento"); Navarro had no responsibilities at NYU. (Def.'s 56.1 Stmt. ¶ 40.)

Approximately four to six weeks after Plaintiff began working with Navarro, she learned that he had complained to Hart about her work performance, particularly that she "was not doing much work and did not want to work." (Def.'s 56.1 Stmt. ¶¶ 41-42.) Navarro testified at his deposition that Plaintiff did not report to work at the appropriate time and containers were not being emptied. (Def.'s 56.1 Stmt. ¶ 45.) Bill Kearney ("Kearney"), Director of Environmental Services for LIJ, stated in

4

an Affidavit that he "receiv[ed] complaints from various LIJ personnel about the areas that Plaintiff was assigned to service." (Def.'s 56.1 Stmt. ¶ 47.)  Hart directed Navarro to work with Plaintiff regarding his complaints and "document the issues." (Def.'s 56.1 Stmt. ¶ 48.)  Defendant alleges that Hart testified that other supervisors also complained about Plaintiff.  (Def.'s 56.1 Stmt. ¶ 49.)  Plaintiff disputes that allegation to the extent that Hart only identified Vento as a supervisor who complained about Plaintiff.  (Pl.'s 56.1 Counterstmt. ¶ 49.)  Similarly, while Defendant alleges that other supervisors gave Plaintiff "warnings," Plaintiff alleges that she received a "discipline form or notification" from Vento after she complained about sexual harassment.  (Def.'s 56.1 Stmt. ¶ 50; Pl.'s 56.1 Counterstmt. ¶ 50.)

Hart contacted Plaintiff regarding Navarro's concerns. (Def.'s 56.1 Stmt. ¶ 52.)  Plaintiff alleges that she advised Hart that Navarro had asked her out and she declined, and that Navarro was assigning her additional work.  (Def.'s 56.1 Stmt. ¶ 52.)  Hart directed Plaintiff to contact her Union.  (Def.'s 56.1 Stmt. ¶ 53.)

Plaintiff alleges that she contacted her Union representative, Raymond Woods ("Woods"), and advised that "Navarro had asked her out, that he said she looked like his ex-girlfriend, and that he offered to let her leave early but still get paid for eight hours if she went out with him."  (Def.'s 56.1 Stmt. ¶¶ 54,

56.) A couple of days later, Woods called Plaintiff, advised that Navarro had denied her allegations, and told Plaintiff to contact him if Navarro made any additional comments. (Def.'s 56.1 Stmt. ¶ 58.) Subsequently, Plaintiff called Woods and told him that Navarro had called her, asked where she was, and when she said she was in the bathroom, Navarro waited for her outside of the door. (Def.'s 56.1 Stmt. ¶ 59.) Plaintiff also advised Woods that Navarro "frequently call[ed] Plaintiff to ask where she was, and he was coming to LIJ and waiting for her." (Def.'s 56.1 Stmt. ¶ 60.) Plaintiff also called Woods to complain that Navarro directed her to "work faster," and "contact him when she finished her duties for additional work." (Def.'s 56.1 Stmt. ¶ 62.) Plaintiff alleges that during this phone call, she also complained that Navarro said he wanted to have sex with her. (Pl.'s 56.1 Counterstmt. ¶ 62.)

Plaintiff, Hart, Navarro, and Woods attended a meeting at Stericycle's Farmingdale facility with Operations Manager Louis Jannotte ("Jannotte"), and Anthony Marino ("Marino"), the Union's business agent. (Def.'s 56.1 Stmt. ¶¶ 64-66.) Woods and Marino represented Plaintiff at the meeting. (Def.'s 56.1 Stmt. ¶ 67.) Hart testified that the meeting's purpose was to discuss Navarro's issues with Plaintiff's performance and Plaintiff's issues with the amount of work assigned to her. (Def.'s 56.1 Stmt. ¶ 68.) Plaintiff disputes that characterization and alleges that she

complained about Navarro's sexual harassment during the meeting. (Pl.'s 56.1 Counterstmt. ¶ 68.) Plaintiff alleges that during this meeting, Plaintiff advised that Navarro asked her out, told her she did not have to pay full-price airfare because he received a military discount, offered to take her to his house in North Carolina, told her that she looked like his ex-girlfriend, and told her that his former employer paid him more than Stericycle to impress her. (Def.'s 56.1 Stmt. ¶ 69.) Plaintiff also advised that Navarro had assigned her additional work and sometimes yelled at her. (Def.'s 56.1 Stmt. ¶ 73.) While Plaintiff alleges that Navarro also told her she could perform oral sex on him, she was too embarrassed to mention this comment during the meeting. (Def.'s 56.1 Stmt. ¶ 71.)

During this meeting, Navarro denied Plaintiff's allegations and alleged that Plaintiff "was slow at her job, that she could not get to work, and that she was sometimes late to work." (Def.'s 56.1 Stmt. ¶ 74.) Marino asked whether Plaintiff could be assigned to a different supervisor. (Def.'s 56.1 Stmt. ¶ 76.) Plaintiff alleges that Hart replied that LIJ had specifically requested a female employee and "they did not want to interfere with the LIJ account." (Def.'s 56.1 Stmt. ¶ 76.) At the end of the meeting, Jannotte looked at Navarro and remarked that "he hoped there would not be a problem again." (Def.'s 56.1 Stmt. ¶ 77.)

From May 23, 2012, through April 29, 2013, Plaintiff took a workers' compensation leave of absence due to a shoulder injury. (Def.'s 56.1 Stmt. ¶¶ 80-81.) During her leave, Plaintiff inquired whether light duty was available and was told it was not. (Def.'s 56.1 Stmt. ¶¶ 84-85; Pl.'s 56.1 Counterstmt. ¶¶ 84-85.)

Plaintiff returned to work in 2013 and resumed working two days per week at Katz and three days per week at NYU. (Def.'s 56.1 Stmt. ¶ 86.) The parties dispute whether Kearney received complaints about Plaintiff's work areas during her leave of absence. (Def.'s 56.1 Stmt. ¶ 87; Pl.'s 56.1 Counterstmt. ¶ 87.) Defendant alleges that when Plaintiff returned, Kearney received complaints from LIJ employees that the rooms Plaintiff was responsible for had not been serviced. (Def.'s 56.1 Stmt. ¶ 87.) Hart directed Navarro to investigate these issues. (Def.'s 56.1 Stmt. ¶ 89.) Defendant alleges that Navarro conducted an investigation and "determined that Plaintiff had issues arriving to work on time, starting work on time, and missing areas that needed to be serviced." (Def.'s 56.1 Stmt. ¶ 90.) Plaintiff disputes this allegation and alleges that Hart testified that he did not know whether Navarro spoke to anyone aside from Plaintiff during his investigation. (Pl.'s 56.1 Counterstmt. ¶ 90.) Plaintiff alleges that Navarro told her that she would be fired if she did not move faster and that she was "going to regret [her] life." (Pl.'s 56.1 Counterstmt. ¶ 92.) Plaintiff concedes that

she could not keep up with her assigned work and believes that Navarro assigned her additional work because of her complaints. (Def.'s 56.1 Stmt. ¶ 93.)

Plaintiff alleges that after she returned to work from her leave of absence, Navarro harassed her by walking behind her, commenting on her rear end and mouth, and asking her to tuck her shirt in. (Def.'s 56.1 Stmt. ¶ 94.) Plaintiff alleges that she continued to contact Woods to complain about Navarro; however, Hart did not receive any calls from Woods. (Def.'s 56.1 Stmt. ¶¶ 95-96.)

Plaintiff alleges that in 2013, she contacted Hart "each time she felt that Navarro was intimidating her," and told him that Navarro "would pick on her, that he would give her hard, heavy work or additional work, and that he would check up on her more than he would the other technicians." (Def.'s 56.1 Stmt. ¶¶ 97-98.) Hart testified that he followed up with Navarro and Navarro advised that he would follow-up on issues that he observed.[2] (Def.'s 56.1 Stmt. ¶ 99.) Hart testified that he did not believe Plaintiff's complaints regarding "harder or heavier work" were

---

[2] The parties dispute whether Hart testified that other LIJ supervisors raised issues. (Def.'s 56.1 Stmt. ¶ 99; Pl.'s 56.1 Counterstmt. ¶ 99.) Hart testified at his deposition that when he spoke to Navarro about Plaintiff's complaints, Navarro said "that he would follow up on, you know, any issues that he would observe, or anything that a supervisor would tell him." (Hart's Dep. Tr., Docket Entry 52-6, 36:15-21.)

valid in light of the equipment Stericycle uses. (Def.'s 56.1 Stmt. ¶ 101; Pl.'s 56.1 Counterstmt. ¶ 101.)

On June 11, 2013, Kearney sent Navarro an email stating that LIJ had previously received complaints about Plaintiff and they continued to receive complaints after she returned to work. (Def.'s 56.1 Stmt. ¶ 102.) Kearney further requested that Navarro "remove [Plaintiff] from the building and provide an alternative." (Def.'s 56.1 Stmt. ¶ 102.) Navarro forwarded Kearney's email to Hart. (Def.'s 56.1 Stmt. ¶ 103.) Hart testified that he was "concerned" upon reading Kearney's email, as "[i]t was an indication that the situation was serious given that Kearney himself had become involved" rather than his subordinates. (Def.'s 56.1 Stmt. ¶ 104.)

On June 13, 2013, Hart and Navarro met with Kearney. (Def.'s 56.1 Stmt. ¶ 108.) Hart testified that Kearney was "adamant" that Plaintiff be removed. (Def.'s 56.1 Stmt. ¶ 109.) Hart further testified that following the meeting, he instructed Navarro to tell Plaintiff to leave LIJ and not to return to the facility, and that Hart would contact her or she should contact Hart. (Def.'s 56.1 Stmt. ¶ 110.) Plaintiff testified that Navarro told her "[g]ive me your badge. You're fired." (Def.'s 56.1 Stmt. ¶ 113.) The parties dispute whether Navarro had the authority to fire employees. (Def.'s 56.1 Stmt. ¶ 115; Pl.'s 56.1 Counterstmt. ¶ 115.)

Hart testified that after his meeting with Kearney, he spoke with Jannotte and they scheduled a meeting with the Union "to discuss Plaintiff's removal from the property." (Def.'s 56.1 Stmt. ¶ 118.) Hart forwarded Marino a copy of Kearney's email. (Def.'s 56.1 Stmt. ¶ 119.) Hart testified that he and Jannotte decided to fire Plaintiff. (Def.'s 56.1 Stmt. ¶ 120.) The parties dispute whether Hart relied on Navarro's complaints in deciding to terminate Plaintiff. (Def.'s 56.1 Stmt. ¶ 122; Pl.'s 56.1 Counterstmt. ¶ 122.) However, Hart testified that he did not think about terminating Plaintiff until he received Kearney's email. (Def.'s 56.1 Stmt. ¶ 123.) Hart also testified that he "did not consider transferring Plaintiff because she had been removed from an entire hospital system" and "employees with performance issues couldn't be relocated." (Def.'s 56.1 Stmt. ¶ 124.)

Hart informed Plaintiff that Kearney requested her removal and directed her to contact the Union. (Def.'s 56.1 Stmt. ¶ 125.) Plaintiff contacted Woods and advised that Navarro told her she was terminated. (Def.'s 56.1 Stmt. ¶ 126.) Subsequently, Plaintiff met with Woods, Marino, Jannotte, Hart, and Navarro. (Def.'s 56.1 Stmt. ¶ 127.) Prior to the meeting, Plaintiff told Marino and Woods that the reason Navarro fired her is because "he wanted to have that sexual [sic] with me and I refused, he ke[pt] giving me more work, more work, more work and he was angry after

the first meeting. He kept pushing it more and more." (Def.'s 56.1 Stmt. ¶ 128.)

At the meeting, Hart presented Plaintiff with Kearney's email; however, Plaintiff "believed that Navarro had manipulated Kearney." (Def.'s 56.1 Stmt. ¶¶ 129-130.) The parties dispute whether Navarro discussed Plaintiff's performance with Kearney, and whether Navarro asked Kearney to request Plaintiff's removal. (Def.'s 56.1 Stmt. ¶¶ 131-32; Pl.'s 56.1 Counterstmt. ¶¶ 131-32.) Plaintiff alleges that on June 11, 2013, an LIJ employee sent Kearney an email with the subject line "Message from Alex (Stericycle)" that stated, in relevant part, "Alex asked [me] to ask you to email him the info on not wanting Rachel in the building." (Pl.'s 56.1 Counterstmt. ¶ 132.) However, Kearney alleges that he requested that Plaintiff be removed from LIJ "based on the complaints he received from LIJ employees and based on his own observations and opinions of Plaintiff's work performance." (Def.'s 56.1 Stmt. ¶ 134.)

On June 24, 2013, Plaintiff's employment was terminated. (Def.'s 56.1 Stmt. ¶ 135.) Plaintiff concedes that Hart did not harass her, but she alleges that Hart retaliated against her. (Def.'s 56.1 Stmt. ¶ 137.) On March 10, 2014, Plaintiff filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC"). (Def.'s 56.1 Stmt. ¶ 7.)

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986). In determining whether an award of summary judgment is appropriate, the Court considers the pleadings, deposition testimony, interrogatory responses, and admissions on file, together with other firsthand information that includes but is not limited to affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

I.   Plaintiff's Affidavit

        The Court construes Defendant's brief as arguing that Plaintiff's Affidavit submitted in conjunction with her opposition papers, (see Pl.'s Aff., Docket Entry 55), should be disregarded in whole or in part. (Def.'s Reply Br., Docket Entry 58, at 1.) Particularly, Defendant argues that Plaintiff's Affidavit contains allegations that were not included in her Rule 56.1 Counterstatement, as well as "unsupported statements and conclusions, mischaracterizations and contradictions of prior testimony, and self-serving assertions." (Def.'s Reply Br. at 1.)

        Federal Rule of Civil Procedure 56(c) provides that affidavits or declarations used to oppose motions for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." FED. R. CIV. P. 56(c)(4). The Second Circuit has held that a party cannot manufacture issues of fact by submitting an affidavit that contradicts her prior deposition testimony. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 104 (2d Cir. 2010). "If, however, the allegations in the affidavit, rather than contradicting, explain

or amplify prior deposition testimony, then the affidavit may create a genuine issue of material fact to defeat summary judgment." Id.

Rather than engaging in a line-by-line review, the Court will disregard any portions of Plaintiff's Affidavit that "are not based on personal knowledge or that rely on hearsay or otherwise inadmissible evidence." M.V.B. Collision, Inc. v. Allstate Ins. Co., 728 F. Supp. 2d 205, 209 (E.D.N.Y. Jul. 27, 2010). To the extent Plaintiff failed to comply with Local Rule 56.1 by failing to include allegations of disputed material facts in her Rule 56.1 Counterstatement that were included in her affidavit, the Court will exercise its broad discretion to overlook her non-compliance. Id. ("[a] district court has broad discretion to determine whether the overlook a party's failure to comply with local court rules") (internal quotation marks and citation omitted; alteration in original).

## II. Hostile Work Environment

The plaintiff states a Title VII hostile work environment claim by establishing that the conduct at issue: "(1) is objectively severe or pervasive, that is, . . . the conduct creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." LaGrande v.

DeCrescente Distr. Co., Inc., 370 F. App'x 206, 209 (2d Cir. 2010)
(internal quotation marks and citation omitted; ellipsis in
original).[3]  This standard necessitates both an objective and
subjective inquiry as "the conduct complained of must be severe or
pervasive enough that a reasonable person would find it hostile or
abusive, and the victim must subjectively perceive the work
environment to be abusive." Littlejohn v. City of N.Y., 795 F.3d
297, 321 (2d Cir. 2015) (internal quotation marks and citation
omitted).

To overcome summary judgment, the plaintiff must proffer
evidence that her "workplace was so severely permeated with
discriminatory intimidation, ridicule, and insult, that the terms
and conditions of [her] employment were thereby altered." Dall v.
St. Catherine of Siena Medical Ctr., 966 F. Supp. 2d 167, 188-89
(E.D.N.Y. 2013) (internal quotation marks and citation omitted).
In determining whether a work environment is hostile, the Court
examines the totality of the circumstances, which include "'the
frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive

---

[3] "Courts in this Circuit treat plaintiff's claims under Title
VII and the [NYSHRL] as analytically identical, applying the
same standard of proof to both claims." Stella v. Brandywine
Sr. Living, Inc., No. 11-CV-1094, 2012 WL 3764505, at *3
(E.D.N.Y. Jul. 9, 2012), report and recommendation adopted, 2012
WL 3764500 (E.D.N.Y. Aug. 27, 2012) (internal quotation marks
and citations omitted).

utterance; and whether it unreasonably interferes with an employee's work performance.'" Littlejohn, 795 F.3d at 321 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993)). However, "limited, infrequent, and at worst, mildly offensive conduct," does not suffice to raise triable issues of fact regarding an objectively hostile work environment. Cristofaro v. Lake Shore Cent. Sch. Dist., 473 F. App'x 28, 30 (2d Cir. 2012).

The Court finds that Plaintiff has raised issues of fact on her hostile work environment claim. Plaintiff worked with Navarro during approximately three months during 2012, and approximately two months in 2013. As set forth above, Plaintiff alleges that in 2012, Navarro asked her out, said she looked like his ex-girlfriend, offered to let her leave early but receive a full day's pay if she went out with him, said he wanted to have sex with her, offered to take Plaintiff to his house in North Carolina, and told her that she could perform oral sex on him. (Def.'s 56.1 Stmt. ¶¶ 56, 62, 69, 71.) Additionally, Plaintiff avers that Navarro frequently called Plaintiff to see where she was, and on one occasion, Navarro waited for her outside of the bathroom door. (Def.'s 56.1 Stmt. ¶¶ 59-60.)

Plaintiff alleges that when she returned to work from her leave of absence in 2013, Navarro told her she had a "nice butt" every time he saw her. (Pl.'s Dep. Tr., Docket Entry 52-5,

291:18-292:2.)  Plaintiff also avers that during this time, Navarro told her "[y]ou have to move faster, you're going to get fired. You're going to regret your life."  (Pl.'s Dep. Tr. 290:11-22.) Additionally, Plaintiff alleges that on a couple of occasions, Navarro referred to her arm and stated "when you get a big arm like that, no man is going to want you, so you don't have no choice, you're going to sleep with me."  (Pl.'s Dep. Tr. 339:14-340:9.)[4]

While Defendant argues that Navarro's remarks were "isolated, periodic, episodic, and in some cases, completely innocuous," (Def.'s Br., Docket Entry 52-1, at 7), the Court disagrees.  Over a total of approximately five months, Navarro made a number of overtly sexual comments that included express references to sexual acts and/or a sexual relationship.  The Court is not persuaded by the fact that Navarro allegedly did not harass Plaintiff during her eleven-month leave of absence, (Def.'s Br. at 7), and finds that his frequent sexual comments during the time that he and Plaintiff were working together could rise to the level of a hostile work environment.  See, e.g., Desardouin v. City of Rochester, 708 F.3d 102, 105-106 (2d Cir. 2013) (holding that a trial was warranted on the plaintiff's hostile work environment claim where her supervisor stated that "her husband was not taking

---

[4] It is unclear from Plaintiff's deposition transcript whether these comments were made in 2012 or 2013.

care of [her] in bed" on a weekly basis for two to three months) (internal quotation marks omitted; alteration in original); Gorzynski, 596 F.3d at 102 (holding that the plaintiff raised triable issues of fact on her hostile work environment claim where the supervisor made approximately six sexual comments, grabbed the plaintiff and other female employees around the waist and tickled them, and "mentally undress[ed]" female employees over the course of seven months); Stella, 2012 WL 3764505, at *4 (holding that triable issues of fact existed regarding the hostile work environment claim where the plaintiff alleged that his supervisor, inter alia, made unwanted sexual advances, tracked [plaintiff] to secluded locations, "extended professional perks," and "touched plaintiff suggestively").

A.   Faragher/Ellerth Affirmative Defense

Defendant argues that summary judgment is warranted based on the Faragher/Ellerth defense. (Def.'s Br. at 8-14.) The Court disagrees.

In an employment discrimination case where "the alleged harasser is a supervisor and no tangible employment action is taken," the defendant may "escape liability" by asserting the Faragher/Ellerth affirmative defense and establishing: (1) it "exercised reasonable care to prevent and correct any harassing behavior" and (2) "that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the

employer provided." <u>Robinson v. Vineyard Vines, LLC</u>, No. 15-CV-4972, 2016 WL 845283, at *4 (S.D.N.Y. Mar. 4, 2016) (internal quotation marks and citations omitted). To satisfy the second prong, "the employer must show that the plaintiff acted unreasonably in failing to avail herself of the company's internal complaint procedures, and then the burden shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures." <u>Grant v. United Cerebral Palsy of N.Y. City, Inc.</u>, No. 11-CV-0018, 2014 WL 902638, at *9 (S.D.N.Y. Mar. 7, 2014) (internal quotation marks and citation omitted).

At the outset, Plaintiff argues that the <u>Faragher/Ellerth</u> defense is unavailable in this case because Navarro was her supervisor. (Pl.'s Br., Docket Entry 56, at 9.) However, the Second Circuit has held that an alleged harasser's status as a supervisor does not preclude the defendant-employer's ability to assert the <u>Faragher/Ellerth</u> defense. <u>Gorzynski</u>, 596 F.3d at 103 (holding that when the alleged harasser is a supervisor, "the objectionable conduct is automatically imputed to the employer . . . [b]ut even then the defending employer may be permitted, subject to proof by a preponderance of the evidence, to raise the <u>Faragher/Ellerth</u> affirmative defense to liability or

damages"). Thus, the question of whether Navarro was Plaintiff's supervisor is of no moment.[5]

It is undisputed that Defendant maintained an anti-sexual harassment policy that contained a complaint procedure, and Plaintiff received a copy of the Harassment Policy. (Def.'s 56.1 Stmt. ¶¶ 9, 11-12, 17.) Additionally, Defendant maintained a "Communications Channels" policy that provided employees with a procedure for reporting "unlawful or unethical situation[s]." (Def.'s 56.1 Stmt. ¶ 21.) While not dispositive, the fact that Defendant promulgated anti-harassment policies "is an important consideration in determining whether [it] has exercised reasonable care to prevent and correct any discriminatory harassment." Setelius v. Nat'l Grid Elec. Servs., LLC, No. 11-CV-5528, 2014 WL 4773975, at *26 (E.D.N.Y. Sept. 24, 2014) (internal quotation marks and citations omitted).

However, "evidence of what an employer does when faced with an actual complaint is another important factor in determining whether a defendant can satisfy the first prong of its affirmative defense[.]" Id. at *27. Defendant argues that Plaintiff's "generalized complaints" did not provide notice that she was

---

[5] The parties also dispute whether Navarro's harassment resulted in a "tangible employment action." (See Pl.'s Br. at 9; Def.'s Reply Br. at 4-5). The Court need not determine this issue because it finds that, as set forth below, "even assuming [Defendant] can raise the defense at the summary judgment stage, the defense fails." Gorzynski, 596 F.3d at 103 n.3.

complaining about sexual harassment and Plaintiff's deposition testimony is conflicting as to whether she used the phrase "sexual harassment" during her 2012 meeting with Hart, Jannotte, Navarro, Woods, and Marino.  (See Def.'s Br. at 11-12.)  Nevertheless, Plaintiff testified that during that 2012 meeting, she stated that Navarro asked her out, offered to take her to his house in North Carolina, and detailed "all the things that [Navarro] wanted to do, that [she] looked like his ex-girlfriend, he loved girls, he don't have a wife, that he will take [her] out."  (Pl.'s Dep. Tr. 171:19-25, 173:25-174:4.)

While a portion of Plaintiff's testimony is arguably inconsistent as to whether she said the words "sexual harassment" at this meeting, (Pl.'s Dep. Tr. 174:22-175:8), when asked if she used the phrase "sexual harassment," Plaintiff responded "yes," (Pl.'s Dep. Tr. 175:9-13), and she later indicated that she used that phrase a "couple times," (Pl.'s Dep. Tr. 176:24-177:6). Additionally, Plaintiff testified that during this meeting she "just ke[pt] saying 'sexual harassment.'  I kept telling them he want to sleep with me.  He offered I can leave work early, and he can pay me less, we can work things out if I agree with him." (Pl.'s Dep. Tr. 176:19-23.)  To the extent a jury credits Plaintiff's testimony, her use of the phrase "sexual harassment" and disclosure of Navarro's overtly sexual conduct sufficed to

place Defendant on notice that she was complaining about sexual harassment.[6]

Plaintiff's alleged complaint during the 2012 meeting was met with total inaction. While Defendant alleges that the meeting "was effective" because Navarro did not harass Plaintiff while she was on medical leave, (Def.'s Reply Br. at 5-6), Plaintiff alleges that Navarro's harassment continued when she returned to work in 2013. (Def.'s 56.1 Stmt. ¶ 94.) Moreover, it is undisputed that Plaintiff's request for a different supervisor was denied, (Def.'s 56.1 Stmt. ¶¶ 75-76), and Defendant did not investigate Plaintiff's claims or discipline Navarro in any way.

Defendant also alleges that Plaintiff failed to follow the procedures set forth in its Harassment Policy and Work Environment Policy, arguing that if Plaintiff was dissatisfied with the outcome of the 2012 meeting, she could have "contacted anyone in Human Resources or called the Help Line, and indeed, per the terms of the policies that is exactly what she should have

---

[6] To the extent that Defendant's brief can be construed as arguing that Plaintiff only used the phrase "sexual harassment" when Hart, Jannotte, and Navarro left the room, (Def.'s Br. at 11 n.2), the Court disagrees. As previously noted, Plaintiff testified that during the 2012 meeting she used the phrase "sexual harassment" a "[c]ouple times." (Pl.'s Dep. Tr. 176:24-177:6.) Plaintiff's testimony that she used the phrase "sexual harassment" when speaking privately with Woods and Marino, (Pl.'s Dep. Tr. 181:5-17), does not indicate that she did not also use this phrase when Hart, Jannotte, and Navarro were present.

done."  (Def.'s Br. at 12-13.)    However, Defendant's Harassment
Policy provides, in relevant part, that "[i]f you . . . want to
report an incident of harassment, you should bring this matter to
your immediate supervisor."   (Harassment Policy, Pl.'s Ex. I,
Docket Entry 55-9, at 4.)    As set forth above, Plaintiff's
"immediate supervisor" attended the 2012 meeting where she
allegedly complained about sexual harassment.[7]    While the
Harassment Policy also provides that an employee should contact
Human Resources if they are uncomfortable speaking with their
supervisor, Plaintiff need not demonstrate that she pursued the
entire "chain of command."   Cf. Gorzynski, 596 F.3d at 104-105
("[w]e do not believe that the Supreme Court, when it fashioned
this affirmative defense, intended that victims of sexual
harassment, in order to preserve their rights, must go from manager
to manager until they find someone who will address their
complaints"); Wilkins v. Time Warner Cable, 10 F. Supp. 3d 299,
314-15 (N.D.N.Y. 2014) (holding that the Faragher/Ellerth defense
did not warrant summary judgment on the plaintiff's ADEA
discrimination claim and noting that the fact that the plaintiff
"did not also contact [Human Resources] directly regarding his

---

[7] Any dispute as to whether Navarro functioned as Plaintiff's
supervisor is of no moment as both Navarro and Hart were present
at this meeting and one or both men would be considered to be
Plaintiff's immediate supervisor.

fear of losing his position does not, as a matter of law, prove that he acted unreasonably").

To that regard, while Defendant argues that "no such facts exist suggesting that any complaints Plaintiff could have made to [Human Resources], the Help Line, or the other reporting methods would have been futile," (Def.'s Reply Br. at 6), the Court disagrees. Assuming the truth of Plaintiff's allegations that she complained about sexual harassment at the 2012 meeting and complained to Hart every day that she worked during 2013, (Pl.'s Dep. Tr. 297:3-298:2), it is undisputed that Defendant did not investigate or take action with respect to her complaints and the Court finds that Plaintiff has raised issues of fact as to whether her failure to "pursu[e] other avenues" was reasonable. Gorzynski, 596 F.3d at 105 ("the facts and circumstances of each case must be examined to determine whether, by not pursuing other avenues provided in the employer's sexual harassment policy, the plaintiff unreasonably failed to take advantage of the employer's preventative measures").

The Court is similarly unpersuaded by Defendant's argument that Plaintiff "has offered no evidence that after the 2012 meeting with the Union she made any additional complaints to Hart or any other member of management regarding alleged sexual harassment by Navarro." (Def.'s Br. at 12; see also Def.'s Reply Br. at 6 (alleging that when she returned from medical leave in

2013, Plaintiff "complained generally about her assigned work and that Navarro was picking on her" rather than sexual harassment)). Though thin, as previously noted, Plaintiff testified that she complained to Hart every day in 2013 and she also asserted that she complained on each occasion that she felt Navarro was "intimidating" her. (Pl.'s Dep. Tr. 297:3-298:2).[8]

   B.  Employer Liability Under the NYSHRL

       "Under the NYSHRL, an employer cannot be held liable . . . for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." E.E.O.C. v. Suffolk Laundry Servs., Inc., 48 F. Supp. 3d 497, 520 (E.D.N.Y. 2014) (internal quotation marks and citations omitted). Specifically, "[a]n employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative conduct, indicate condonation." Clark v. City of N.Y., No. 13-CV-0210, 2014 WL 4804237, at *4 (E.D.N.Y. Sept. 25, 2014) (internal quotation marks and citation omitted). As addressed more fully above, Defendant's total inaction in response to Plaintiff's

---

[8] The parties dispute whether the Court may consider Plaintiff's allegations regarding Navarro's conduct toward her replacement, Tiffany Anderson-Moore. (Compare Pl.'s Br. at 13-14; Def.'s Reply Br. at 5, n.5.) The Court need not determine this issue in light of its determination that summary judgment on Plaintiff's hostile work environment claim is inappropriate.

alleged complaints constitutes condonation such as to impute liability to Defendant for Navarro's conduct.[9]

Accordingly, summary judgment on Plaintiff's Title VII and NYSHRL hostile work environment claims is DENIED.

## III. Retaliation

Title VII and NYSHRL retaliation claims are analyzed pursuant to the McDonnell Douglas burden shifting framework. Setelius, 2014 WL 4773975, at *19. First, Plaintiff must demonstrate a prima facie retaliation claim. Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010). At this stage, the plaintiff's burden is "de minimis" and the Court's role is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." Id. (internal quotation marks and citation omitted). If the plaintiff states a prima facie case, "a presumption of retaliation arises" and the defendant must set forth a "legitimate, non-retaliatory reason for the adverse employment action." Id. (internal quotation marks and citation omitted). If the defendant meets that burden, "the presumption of retaliation dissipates, and

---

[9] Defendant alleges that it may assert the Faragher/Ellerth with respect to Plaintiff's NYSHRL claim. (Def.'s Reply Br. at 7.) "Whether the Faragher/Ellerth defense is available to claims brought under the NYSHRL is not a fully-settled question." Setelius, 2014 WL 4773975, at *29, n.25. However, the Court need not determine this issue. As set forth above, issues of fact preclude the application of the Faragher/Ellerth defense at this juncture.

the employee must show that retaliation was the 'but-for' cause of the challenged employment action." <u>Geller v. N. Shore Long Island Jewish Health Sys.</u>, No. 01-CV-0170, 2013 WL 5348313, at *8 (E.D.N.Y. Sept. 23, 2013) (quoting <u>Univ. of Texas SW. Med. Ctr. v. Nassar</u>, --- U.S. ----, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013)).[10]

To state a <u>prima facie</u> case for retaliation, the plaintiff must demonstrate: "(1) participation in an activity protected by federal discrimination statute; (2) the defendant was aware of this activity; (3) an adverse employment action; and (4) a causal connection between the alleged adverse action and the protected activity." <u>Dall</u>, 966 F. Supp. 2d at 192.

Defendant argues that Plaintiff has not established that she engaged in protected activity. (Def.'s Br. at 15.) Defendant does not dispute that Plaintiff's termination constitutes an adverse action,[11] but alleges that even if she can demonstrate that

---

[10] The Court acknowledges that it is unclear whether the "but-for" causation standard set forth in <u>Nassar</u> applies to NYSHRL claims. <u>Joseph v. Owens & Minor Distr., Inc.</u>, 5 F. Supp. 3d 295, 316 n.11 (E.D.N.Y. 2014), <u>aff'd</u>, 594 F. App'x 29 (2d Cir. 2015). However, "since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that Federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under the NYSHRL in a manner consistent with Title VII jurisprudence as clarified by the Supreme Court in <u>Nassar</u>." <u>Id.</u>

[11] Plaintiff does not argue that her allegedly increased workload constitutes an adverse employment action. (See generally Pl.'s

she engaged in protected activity, "there was no causal connection between any such activity and her termination." (Def.'s Br. at 15.) The Court will address protected activities and causation in turn.

### A. Protected Activities

"A protected activity is action that protests or opposes statutorily prohibited discrimination." Giscombe v. N.Y. City Dep't of Educ., 39 F. Supp. 3d 396, 401 (S.D.N.Y. 2014) (internal quotation marks and citation omitted). Protected activities under Title VII include informal complaints to the plaintiff's supervisors, commencing litigation, or filing a formal complaint. Id. However, "[a]n implicit requirement of . . . the employer's awareness of the protected activity, is that the employer understood, or could reasonably have understood that the plaintiff's opposition was directed at conduct prohibited by Title VII." Grant, 2014 WL 902638, at *11 (internal quotation marks and citation omitted).

Plaintiff alleges that she engaged in the following protected activities: (1) complaining to Navarro, Hart, and

---

Br. at 19.) In any event, while "[a]n increase in workload may be an adverse action for purposes of a retaliation claim if the increase is heavily disproportionate to those similarly situated," Hardial v. EmblemHealth, Inc., No. 14-CV-4968, 2016 WL 3693750, at *12 (E.D.N.Y. Jul. 7, 2016) (internal quotation marks and citations omitted), the record does not contain any evidence regarding the workloads of similarly situated Stericycle employees.

Jannotte during their 2012 meeting with her union representatives, and (2) telling Navarro in May 2013 that "if he did not leave her alone, she would get a lawyer," which Navarro allegedly repeated to Hart on the phone. (Pl.'s Br. at 18.)

As set forth more fully above, Plaintiff has raised issues of fact as to whether she complained about sexual harassment during her 2012 meeting with Hart, Jannotte, Navarro, Woods, and Marino. To the extent a jury credits Plaintiff's testimony, she engaged in a protected activity during this 2012 meeting. Hart and Jannotte would have reasonably understood that Plaintiff was opposing conduct prohibited by Title VII based on Plaintiff's alleged use of the phrase "sexual harassment" and disclosure of Navarro's overtly sexual conduct.

Conversely, Plaintiff has not established that her remark to Navarro that she intended to get a lawyer if he did not leave her alone constitutes a protected activity that Defendant was aware of. When asked why she believed she was fired from Stericycle, Plaintiff testified: "I got fired because Navarro asked me out and I refused and he started giving me work and work and work to do and at one point, I got injured at work because he was pushing me too much and I told him that if he don't leave me alone I will get a lawyer." (Pl's Dep. Tr. 82:4-11; see also Pl.'s Dep. Tr. 269:10-13 ("[o]ne complaint I made in May, I told [Navarro] 'If you don't leave me alone, I'll get a lawyer.'").)

Putting aside the parties' dispute as to when this comment was made, (see Def.'s Reply Br. at 8), this non-specific remark would not have made Defendant reasonably aware that Plaintiff was opposing statutorily prohibited conduct--namely, Navarro's sexual harassment and/or alleged retaliation for Plaintiff's complaints.

   B.   Causation

      Assuming that Plaintiff has stated a prima facie retaliation claim, Defendant has proffered a legitimate, non-discriminatory reason for terminating Plaintiff.  Cf. Boston v. Taconic Mgmt. LLC, No. 12-CV-4077, 2016 WL 5719751, at *5 (S.D.N.Y. Sept. 30, 2016) (noting, in its discussion of the plaintiff's discrimination claim, that "the court may assume that a plaintiff has established a prima facie case and skip to the final step in the analysis, as long as the employer has articulated a legitimate nondiscriminatory reason for the adverse employment action") (internal quotation marks and citation omitted).  Particularly, Defendant points to Kearney's email to Navarro stating that LIJ had received complaints about Plaintiff and requesting that she be removed from the building.  (Def.'s Br. at 19-20.)  See, e.g., Joseph, 5 F. Supp. 3d at 319 (holding that "customer dissatisfaction" was a legitimate, non-retaliatory reason for the plaintiff's termination).

      Whether Plaintiff has raised issues of fact regarding pretext presents a closer issue.  Plaintiff principally argues

that Navarro assigned her more work than she could handle and "manipulated Kearney into blaming [Plaintiff] for mistakes that were not her fault." (Pl.'s Br. at 21.) Plaintiff refers to Navarro's email to Kearney's assistant stating that Navarro asked her to request that Kearney "email him the info on not wanting [Plaintiff] in the building." (Pl.'s Br. at 22.) Plaintiff also alleges that Kearney's assertion that there were no complaints about Defendant's services at Katz during Plaintiff's medical leave is belied by emails in the record. (Pl.'s Br. at 22.) Additionally, Plaintiff avers that she would not have been assigned three additional days at LIJ in 2013 if there had been complaints about her in 2012. (Pl.'s Br. at 23.)

However, Plaintiff effectively concedes that Hart and Jannotte made the ultimate decision to terminate her, not Navarro. (Def.'s 56.1 Stmt. ¶ 120.)[12] In light of the absence of any evidence that Hart or Jannotte harbored retaliatory animus, it appears that Plaintiff is essentially arguing that the theory of

---

[12] In her Rule 56.1 Counterstatement, Plaintiff does not dispute that Hart "testified" that he and Jannotte made the ultimate decision to terminate her. (Pl.'s 56.1 Counterstmt. ¶ 120; Def.'s 56.1 ¶ 120.) However, aside from Plaintiff's allegation that "Hart was manipulated into firing her," (Pl.'s 56.1 Counterstmt. ¶ 121), Plaintiff has not alleged that another individual at Stericycle, i.e., Navarro, was actually responsible for the decision to terminate her. The record similarly does not contain any evidence to refute the notion that Hart and/or Jannotte ultimately decided to terminate Plaintiff. Thus, the Court finds that there are no factual disputes on this issue.

"cat's paw" liability is applicable based on Navarro's alleged manipulation of Hart and/or Kearney.

"Cat's paw" liability "refers to a situation in which an employee is fired . . . by a supervisor who himself has no discriminatory motive but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." Vasquez v. Empress Ambulance Servs., Inc., 835 F.3d 267, 271 (2d Cir. 2016). In Vasquez, the plaintiff alleged that within hours of reporting her coworker's sexual harassment, the coworker presented management with manipulated pictures and text messages indicating that he and the plaintiff had engaged in a sexual relationship and the plaintiff had sent him a "racy, self-taken photo." Id. Hours later, a committee concluded that the plaintiff and the coworker had an inappropriate sexual relationship. Id. The employer declined to show the plaintiff the photograph in question or review the plaintiff's phone, and fired the plaintiff for sexual harassment. Id. at 270-71.

The Second Circuit held that the "cat's paw" theory may be used to support Title VII retaliation claims and the plaintiff "pled facts from which a reasonable person could infer that [the defendant] knew or should have known that [the coworker's] accusations were the product of retaliatory intent and thus should not have been trusted." Id. at 273, 276. However, the Court noted

that an employer is not liable merely because it took action based on information provided by a biased employee as "[o]nly when an employer in effect adopts an employee's unlawful animus by acting negligently with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision, can the employee's motivation be imputed to the employer[.]" Id. at 275 (emphasis in original).

Here, the impetus for Plaintiff's termination was an email from Kearney, a third-party not employed by Stericycle, who allegedly acted on information provided by Navarro. (Kearney Email, Pl.'s Ex. E, 55-5.) Kearney testified in an Affidavit that he spoke with Navarro and requested that Plaintiff be removed from LIJ "based on the complaints [he] received from LIJ employees and based on [his] own observations and opinions of Plaintiff's work performance." (Kearney Aff., Def.'s Ex. 4, Docket Entry 52-7, ¶¶ 16-18.) Kearney also alleges that he did not receive any complaints about sharps services at Katz while Plaintiff was on medical leave. (Kearny Aff. ¶ 12.)

Plaintiff attempts to discredit Kearney by alleging that there were, in fact, complaints during her leave of absence. (Pl.'s Br. at 22 (citing Pl.'s Ex. H, 55-8).) However, the emails cited by Plaintiff do not demonstrate that there were complaints about Stericycle employees at Katz. Many of these emails pertain to the emergency room unit, and the emails relating to Katz and/or

34

the Labor and Delivery unit address the frequency of sharps pickups, supply issues, and an issue regarding the sizing of sharps containers. (Pl.'s Ex. H.) The one email that could arguably be construed as a complaint was Navarro's email sent on May 7, 2013--after Plaintiff had returned to work--in which he states "Katz Women's Hospital OR Dep't 3rd Fl – Tower Full of trash."[13] (Pl.'s Ex. H at 12.)

Plaintiff also argues that the "Employee Communications Notices" that Navarro prepared documenting her alleged infractions (collectively, the "Employee Notices") do not reference any complaints from LIJ. (Pl.'s Br. at 23; see also Employee Notices, Pl.'s Ex. D, Docket Entry 55-4.) However, these Employee Notices are dated between March 29, 2012, and April 17, 2012.[14] Plaintiff continued working at LIJ until she began her leave of absence on May 23, 2012 and Plaintiff resumed working at LIJ when she returned

---

[13] The factual dispute as to whether Kearney personally observed Plaintiff, (see Pl.'s Br. at 22 ("Kearney's claim that he occasionally saw [Plaintiff] at work is incorrect, as [Plaintiff] had no interaction with Kearney") (internal quotation marks and citation omitted)), is of little relevance to the issue of pretext based on Kearney's testimony that he also relied on LIJ employees' observations and complaints in requesting Plaintiff's removal. (See Kearney Aff. ¶¶ 16-18.)

[14] The Court notes that one Employee Notice is dated April 12, 2010. (Employee Notices at 4.) As it is undisputed that Plaintiff and Navarro did not begin working together until early 2012, (Def.'s 56.1 Stmt. ¶¶ 31, 34-35), the Court assumes that this Employee Notice contains a typographical error and was prepared on April 12, 2012.

to work on April 29, 2013.  (See Def.'s 56.1 Stmt. ¶ 81.)  Thus, these Employee Notices do not address the time that Plaintiff was working at LIJ between April 18, 2012 and May 22, 2012.  To that regard, while Plaintiff attempts to raise issues of fact by noting that she was assigned additional days at LIJ in 2013 notwithstanding the alleged prior complaints about her, (Pl.'s Br. at 22-23), Hart testified that Navarro advised him that LIJ had complained about Plaintiff but Stericycle had to investigate the complaints about Plaintiff to determine "what the problems are, if the problems are correctable or not," (Hart's Dep. 65:18-66:13).

Parenthetically, Plaintiff cites Dominick v. Hospitality Valuation Servs., Inc., No. 11-CV-3452, 2013 WL 5460654 (Sept. 30, 2013), a Title VII pregnancy discrimination case, for the proposition that the denial of summary judgment is appropriate "where the plaintiff was fired based on a customer complaint where that customer's complaint may not have been justified." (Pl.'s Br. at 22 (internal quotation marks omitted).) However, in Dominick, the plaintiff alleged that her supervisor told her he did not have any issues with her work, another supervisor asked her to stay an additional month, and she had received positive feedback.  Dominick, 2013 WL 5460654, at *9. Additionally, while the Dominick plaintiff's performance evaluations indicated low performance in some areas, they also reflected strength in other areas.  Id.  Notably, the Dominick

employer provided the plaintiff with conflicting reasons for her termination.  Id. at *10.  In the case at bar, while Plaintiff received a safety award in 2010, (Pl.'s Ex. B, Docket Entry 55-2), Plaintiff has not proffered evidence that she received positive performance evaluations.  Further, Plaintiff has not alleged that she received conflicting explanations for her termination.

Additionally, Plaintiff alleges that Navarro "set [her] up to fail by giving her more work than anyone could possibly do, so that she was more likely to make mistakes, and blaming her for mistakes that other people made."  (Pl.'s Br. at 21.)  However, Plaintiff has not adduced any evidence to support the notion that she was assigned an insurmountable workload or that her colleagues' mistakes were attributed to her.  While Plaintiff testified that Navarro changed her schedule to require that she service Katz in four hours, rather than eight, the record does not contain any information regarding the amount of work assigned to similarly situated Sharps Specialists.[15]  (Pl.'s Dep. Tr. 337:11-21.) Plaintiff has also failed to provide any specific examples of

---

[15] Plaintiff also submitted a document titled "Employee Work Instructions" and dated April 17, 2012.  (Employee Instr., Pl.'s Ex. C, Docket Entry 55-3.)   While this document directs Plaintiff to service six floors of the Katz building in four hours, it also states "[w]ith small Internal Cart filled all floors can be serviced without returning to supply staging area. This will save major time in service."  (Employee Instr.)

incidents where she was wrongly blamed for another employee's mistake.[16]

Even assuming, _arguendo_, that Kearney's request for Plaintiff's removal was based on biased information provided by Navarro, the record does not contain any facts that would indicate Hart and/or Jannotte acted negligently in terminating Plaintiff based on Kearney's email. See Vasquez, 835 F.3d at 275.   Although Plaintiff argues that Navarro was involved in the decision to terminate her employment based on his discussions with Kearney and Hart, she has not adduced evidence that would raise issues of fact as to whether Navarro "had significant influence over the chain of events that resulted in Plaintiff's termination." Elmessaoudi v. Mark 2 Restaurant LLC, No. 14-CV-4560, 2016 WL 4992582, at *12 (S.D.N.Y. Sept. 15, 2016).   Potential hearsay issues aside, while Plaintiff places great weight on an email from an LIJ employee to Kearney stating, "[Navarro] asked me to ask you to email him the info on not wanting [Plaintiff] in the building," (Pl.'s Ex. F, Docket Entry 55-6), the Court is not persuaded that Navarro's alleged request that Kearney send him an email raises issues of

---

[16] Plaintiff testified that Navarro told her that Kearney complained about her but when she went to LIJ to find about the complaint, "I find out it's another building and not one of the supervisors come to me once to ask me which building did I serve." (Pl.'s Dep. Tr. 84:9-86:5.)   Putting aside any hearsay concerns, this allegation is too vague to raise issues of fact as to whether Navarro blamed Plaintiff for other employees' errors.

fact regarding his influence over Kearney in light of Kearney's previously noted testimony that his request for Plaintiff's removal was based on his observations and information he received from LIJ staff (Kearney Aff. ¶¶ 15, 17-18). Additionally, while Navarro testified that he forwarded information to his superiors and when they asked him what happened with Plaintiff, he stated that he did not like Plaintiff's work ethic, he also testified that he did not tell anyone that he did not like Plaintiff's work and he was not aware who made the decision to terminate Plaintiff. (Navarro's Dep. Tr., Pl.'s Ex. 5, Docket Entry 52-8, 123:21-12.)

Plaintiff appears to argue the gap of time between her removal from LIJ and her termination raises questions as to whether Kearney's email was the actual reason she was fired. (Pl.'s Br. at 24; see also Def.'s 56.1 Stmt. ¶¶ 108, 135.) The record reflects that Kearney sent his email on June 11, 2013; Hart and Navarro met with Kearney on June 13, 2013; Plaintiff was told to leave LIJ on June 13, 2013; and thereafter, Hart met with Jannotte, and Plaintiff met with Woods, Marino, Jannotte, Hart, and Navarro, at which time she was presented with Kearney's email. (Def.'s 56.1 Stmt. ¶¶ 102, 107-108, 112, 127-29.) If anything, the approximately eleven days between Plaintiff's removal from LIJ and her termination belies the notion that Stericycle acted negligently, as Hart had multiple meetings about Kearney's email prior to terminating Plaintiff. Cf. Taconic Eastchester Mgmt.,

2016 WL 5719751, at *8 (rejecting the plaintiff's cat's paw theory where, inter alia, the record did not indicate that the defendant "'blindly credited'" the allegedly biased employee's comments in deciding to terminate the plaintiff).

Similarly, while Plaintiff questions why she was terminated rather than transferred, Hart testified that Stericycle did not consider transferring Plaintiff because she was removed from an entire hospital system and employees with "bad performance" could not be relocated. (Hart.'s Dep. Tr. 60:7-15.) In any event, Defendant's decision to terminate Plaintiff rather than transfer her is a business decision that the Court is not prepared to question. See Joseph, 5 F. Supp. 3d at 319 (noting that courts are not empowered to "sit as super personnel departments, assessing the merits--or even the rationality--of employers' nondiscriminatory business decisions") (internal quotation marks and citation omitted).

Finally, the Court fails to take the quantum leap suggested by Plaintiff in arguing that Defendant's failure to provide her with an opportunity to "defend herself" prior to her termination leads to the conclusion that Navarro "intentionally creat[ed] an issue that he could use to fire [Plaintiff]." (Pl.'s Br. at 23.) Plaintiff cites Palumbo v. Carefusion 2200, Inc., No. 12-CV-6282, 2014 WL 3921233 (W.D.N.Y. Aug. 11, 2014), an ADEA case, for the notion that the failure to conduct a thorough investigation

and provide the plaintiff with an "'adequate opportunity to present her side of the story'" supports the inference that the "'stated reasons for Plaintiff's termination were pretextual.'" (Pl.'s Br. at 23 (citing Palumbo, 2014 WL 3921233, at *12).) However, in denying summary judgment on the ADEA discrimination and retaliation claims, the Palumbo Court also considered other allegations supporting pretext, not the least of which being that the defendant alleged that it placed the plaintiff on a performance improvement plan due to customer complaints but the defendant failed to reference the alleged customer complaints during an earlier proceeding before the New York State Division of Human Rights. Palumbo, 2014 WL 3921233, at *11-12. Additionally, the record contained evidence raising issues of fact as to whether younger coworkers received preferential treatment and/or the decision to terminate the plaintiff was made prior to one of the customer complaints. Id. at *12-13.

    In the case at bar, Plaintiff met with Hart, Jannotte, Navarro, Woods, and Marino after Navarro allegedly told her that she was fired but before she was formally terminated on June 23, 2013. (Def.'s 56.1 Stmt. ¶¶ 110-14, 127, 135.) Thus, it is unclear whether Plaintiff was provided with an opportunity to "defend herself." In any event, even if Defendant's investigation of Kearney's complaint was inadequate based on their failure to interview Plaintiff before deciding to terminate her, the Court

finds that a reasonable juror could not conclude that "but-for" Navarro's retaliation, Plaintiff would not have been terminated. Accordingly, Defendant's motion for summary judgment is GRANTED as to Plaintiff's Title VII and NYSHRL retaliation claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Docket Entry 52) is GRANTED IN PART and DENIED IN PART. Defendant's motion is DENIED with respect to Plaintiff's Title VII and NYSHRL hostile work environment claims and GRANTED with respect to Plaintiff's Title VII and NYSHRL retaliation claims.

SO ORDERED.


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     February __13__, 2017
           Central Islip, New York